**Zita M. ROBERTS, Plaintiff,**

v.

**Jo Anne B. BARNHART, Commissioner of Social Security, Defendant.**

**No. 4:02–CV–90618.**

United States District Court, S.D. Iowa, Central Division.

Sept. 24, 2003.

Timothy N. Tripp, Pella, IA, for plaintiff.

Christopher D. Hagen, United States Attorney, Des Moines, IA, for defendant.

## ORDER

PRATT, District Judge.

Plaintiff, Zita M. Roberts, filed a Complaint in this Court on December 5, 2002, seeking review of the Commissioner's decision to deny her claim for Social Security benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 *et seq.* This Court may review a final decision by the Commissioner. 42 U.S.C. § 405(g). For the reasons set out herein, the decision of the Commissioner is reversed.

## BACKGROUND

Plaintiff filed her application for Supplemental Security Income Benefits on January 31, 2000. Tr. at 139–41. After the application was denied initially and on reconsideration, Plaintiff requested a hearing before an Administrative Law Judge. A hearing was held before Administrative Law Judge John P. Johnson (ALJ) July 25, 2001. Because Plaintiff had not yet obtained representation, the ALJ continued the hearing to allow Plaintiff to contact a lawyer. Plaintiff appeared with counsel on May 7, 2002. Tr. at 64–110. The ALJ issued a Notice of Decision— Unfavorable on June 28, 2002. Tr. at 17–36. The ALJ's Decision was affirmed by the Appeals Council of the Social Security Administration on October 11, 2002, Tr. at 6–8. A Complaint was filed in this Court on December 5, 2002.

## MEDICAL EVIDENCE

On March 17, 2000, Plaintiff was seen for an examination by a physician identified as Dr. Hart (Tr. at 3). Tr. at 197–201. Plaintiff complained of chronic shoulder bursitis and tendonitis, and left foot tendonitis. She also said that she was bothered by her left hip, knees, and elbows. Plaintiff, who was 42 years old at the time

of the examination, said that she was unable to work since a bicycle accident in June of 1995, when she had hit a pothole and landed on her left side. On review of systems, Plaintiff was described as markedly obese. Plaintiff reported an episode of blacking out on March 13, 2000. Plaintiff said that the most she can lift is 20 pounds and the most she can carry is 5 pounds. She said that she can walk less than a block and stand for 10 minutes. She said that she can sit for 30 minutes in one position. Tr. at 197. On physical examination, Plaintiff was 60½ inches tall and she weighed 313 1/4 pounds without shoes. First among a list of 10 diagnoses was morbid obesity. The doctor concluded his report by writing that although it was difficult to objectively assess, Plaintiff was "quite impaired" by pain. The doctor said that obesity significantly contributed to the back pain as well as other areas. Tr. at 198. An x-ray of Plaintiff's lumbar spine was negative. Tr. at 201.

On March 26, 2001, Plaintiff was seen at the University of Iowa Hospitals and Clinics by Joseph J. Chen, M.D. on referral from Stephen M. Mineart, M.D. for an evaluation of chronic back pain. Plaintiff reported that the back pain had started seven years before the examination while she was working at a nursing home. Plaintiff said that the pain started when a resident of the home hit her in the shoulder. She stopped working at the nursing home in 1996 after a lower extremity fracture which had subsequently healed. Plaintiff described her pain as a constant radiating, aching and burning pain. She said that she got some relief from medication, and that bending, lifting, working, walking or sitting made the pain worse. Plaintiff said that her husband helped her get dressed, and that she did very little in the way of house or yard work. On physical examination, Plaintiff was described as a well developed morbidly obese woman.

Plaintiff's gait was normal. Her range of motion was limited by fifty percent due to complaints of pain. Tr. at 241. Inspection of Plaintiff's back revealed tenderness at the gluteal attachment, and there were multiple tender points in the upper and lower extremities. Although the doctor found no evidence of radiculopathy, his diagnosis was that Plaintiff was a 43 year old morbidly obese woman with chronic myofascial neck and back pain. The doctor talked to Plaintiff about being more active in her rehabilitation. The doctor concluded the report by recommending that Plaintiff return for a full day functional activity evaluation so that she could learn some tools for managing her chronic myofascial pain. Tr. at 242.

Dr. Mineart submitted copies of his treatment notes from March 17, 2000, through October 31, 2001. Tr. at 248–52. Along with these office notes, the doctor responded to a set of interrogatories submitted by Plaintiff's counsel. Tr. at 253–56. The doctor said that Plaintiff's diagnoses were chronic back and shoulder pain and depression. The doctor said that Plaintiff's pain was aggravated by most activities and that it was a constant aching and intermittent shooting sharp pain. In response to a question asking him to identify the clinical findings and objective signs, the doctor wrote "morbidly obese, tenderness generalized upper and lower back." Tr. at 253. Dr. Mineart wrote that depression and other psychological factors contributed to the severity of Plaintiff's symptoms and functional limitations. He said that Plaintiff's pain would often be severe enough to interfere with her attention and concentration. The doctor said that Plaintiff would be capable of low stress jobs. The doctor opined that Plaintiff can walk one or two city blocks. He said that she can sit 20 minutes at a time (Tr. at 254) and be on her feet for about 10

minutes at a time. It was the doctor's opinion that Plaintiff can sit/stand/walk for less than two hours of an eight hour day. The doctor indicated that if Plaintiff was sitting, she would need to walk for five minutes every thirty minutes. He said that Plaintiff would need to take unscheduled breaks from her work every hour and that the breaks would need to last an average of five minutes each. Tr. at 255. The doctor said that Plaintiff could lift a maximum of 10 pounds and only on an occasional basis. He said that she should never lift 20 or 50 pounds. He said that Plaintiff was significantly restricted in her ability to reach. The doctor said that Plaintiff would have more than four bad days each month which would cause her to be absent from work. Tr. at 256.

Plaintiff was seen for an examination by Allan Peterson, M.D. on December 10, 2001. Dr. Peterson's examination concentrated on four problems: obesity, depression, myofascial pain, and asthma. Plaintiff's weight was in excess of 300 pounds and "significantly affects her sense of well-being and contributes to her myofascial pain." Plaintiff was being treated for depression with Prozac which she started taking in April of that year. The doctor wrote: "I think that the patient's myofascial pain, which involves lower back, upper back, shoulders, and headaches is affected by her depression and by her obesity." Plaintiff said that she had been diagnosed with asthma at age 24, but had not been bothered until the previous 3 or 4 months. She was using an albuterol inhaler 3–4 times a day. Plaintiff's medications were Prozac, muscle relaxants and Tylenol for pain and headaches, and the albuterol for the asthma. Tr. at 257. Under the heading of Social History, it is noted that Plaintiff dropped out of school in the 11th grade and subsequently earned a GED. The doctor wrote:

The patient was married at age nineteen and her first marriage lasted from 1976 until 1981 and resulted in a divorce. Her second marriage was from 1983 to 1993 and again resulted in divorce. Her husband from that marriage is currently in prison for molesting their daughter and son. Her daughter is currently age fourteen and the son who was molested is age ten. Her ten year old son has been diagnosed with ADHD and Oppositional Defiant Disorder and has problems with enuresis and encopresis. Two other of her children have also been diagnosed with ADHD. Her third marriage was in 1997 and they separated in 1998. The patient has a daughter, age twenty-four, living in Canada and a sixteen, fourteen, twelve, and ten year-old.

On physical examination, Plaintiff was 62 inches tall and weighed 301 pounds. Plaintiff's blood pressure was 140/90. Plaintiff demonstrated good grips bilaterally, and there was no particular weakness or limitation of range of motion in her extremities. In a discussion of Plaintiff's physical capacity, Dr. Peterson noted that Plaintiff is limited by obesity in regard to standing, moving about, walking, or sitting during an eight hour day. He also said that Plaintiff is unable to stoop, climb, kneel, or crawl very well because of being overweight. Tr. at 258. The doctor concluded his report:

I think her first three problems are interrelated in that her obesity results in her not being able to bend over or lift much and if she does, she has back pain upper and lower which is her myofascial pain. Her obesity makes her more prone to depression and she has low self-esteem. Certainly her social history with her marital history and recurrent problems with her youngest three children contribute to stress to the patient.

Tr. at 259.

Plaintiff saw psychiatrist Monte L. Bernhagen, M.D. for a 90 minute evalua-

tion on December 18, 2001. Tr. at 260–62. Plaintiff described difficulty sleeping. She said that she goes to bed around midnight but has multiple awakenings. When she gets up at 6:30 or 7:00 a.m., she has had only about four hours of sleep and does not feel rested. The doctor opined that Plaintiff would benefit from a sleep study due to her obesity. Plaintiff said her energy was non-existent and that her concentration was not good. Plaintiff reported a lack of interest and a lack of motivation. "She feels hopeless, at times helpless, useless and worthless." Tr. at 260. On mental status examination, Plaintiff was described as being a 44 year old morbidly obese Caucasian female. "She has extremely strong body odor and she actually urinated in our chair." Tr. at 261. On Axis I, Dr. Bernhagen's diagnoses were depressive disorder, NOS, and social phobia. On Axis II, his diagnosis was borderline and dependent personality traits. The doctor recommended that Plaintiff continue to take the Prozac which had been prescribed by Dr. Mineart. Again, he recommended a sleep study to determine if her depressive symptoms are related to sleep apnea and morbid obesity. The doctor concluded his report by opining that although Plaintiff was not disabled by depression, "her morbid obesity would cause a significant impairment for her." The doctor wrote that he did not believe that Plaintiff could sustain or maintain significant employment. The doctor wrote: "I do not believe that she would interact appropriately with supervisors, co-workers and the public. The patient has an extremely foul body odor and I do believe that most co-workers and the public would find this rather offensive and that issue would have to be dealt with appropriately." Tr. at 262.

On December 19, 2001, Plaintiff underwent a pulmonary function study at Ottumwa Regional Health Center. Tr. at 263–65. The test does not appear to be accompanied by a professional interpretation.

On May 3, 2001, Plaintiff was seen by Marc E. Hines, M.D. on referral from Dr. Mineart. It was Dr. Hines conclusion that Plaintiff "most probably has rather considerable osteoarthritis and general somatic dysfunction in the upper thoracic, mid and lower thoracic and upper lumbar regions." Dr Hines also noted tenderness in the spinous processes and stated that he was also concerned about the possibility of spondylolisthesis. Dr. Hines stated that Plaintiff appeared to have some AC joint dysfunction in the medial scapular area bilaterally and some trigger point dysfunction in the paraspinous, rhomboid and lower trapezius muscles. Plaintiff had lost 30 pounds of weight in the recent past and Dr. Hines was concerned that she may have been losing muscle mass. "There is enough weakness on examination today to make me concerned that the rapid weight loss that she describes may actually be in the long run harmful." Tr. at 267. In spite of the 30 pound loss of weight, Plaintiff weighed 306 pounds. Tr. at 269.

### ADMINISTRATIVE HEARING

Plaintiff, with counsel, appeared and testified at an administrative hearing on May 7, 2002, Tr. at 69–110. When asked why she is unable to work, Plaintiff responded: "Because I have back pain, shoulder pain, leg pain, hip pain. Some days it's worse than others. I have problems lifting and carrying things...." Tr. at 75. Plaintiff said that she has headaches on a daily basis. Tr. at 76–77. Plaintiff said that pain in the various parts of her body causes her to have disturbed sleep. Tr. at 78. Plaintiff said that she is treated for depression by Dr. Mineart who prescribes Prozac. Plaintiff testified that she only leaves her home once or twice a month to

do grocery shopping because her home is the only place she feels safe. Tr. at 82.

Plaintiff testified that she is five feet, two inches tall, and that she weighs 350 pounds. Plaintiff said that she was aware that she had gained weight since the consultative examinations. Tr. at 84–85.

Plaintiff was asked about he duties as nurse's aide to which she responded:

> It involved taking care of the residents from the beginning of the shift to the end of the shift, getting them up from their afternoon naps, getting them ready for their supper meal, giving them showers, After that, getting them back into bed for the night, checking on them, making sure they're okay and make sure they haven't soiled or wet themselves.

Tr. at 87. Plaintiff said that her duties included recording her activities into the patients' charts. She said that she took vital signs on occasion, but did not dispense medication. Tr. at 88. Later, Plaintiff testified that she only took vital signs on two residents during the entire time she worked as a nurse's aide. Tr. at 102.

Plaintiff said that she is not able to walk the length of a block because of pain in her back and because she becomes short of breath. Tr. at 91. She said that she can only stand for about five minutes. She said that climbing stairs makes it hard for her to breathe. She said that she can lift about 10 pounds on a good day. Tr. at 92. Plaintiff said that she is only able to sit for 15 to 20 minutes at a time. Plaintiff said that she has problems with her memory and concentration and that her mind wonders. Tr. at 93. She said that when she feels stress, "Usually, I get up and walk away so as to not cause a scene." Tr. at 94.

Plaintiff said that she gets up around 7:00 or 8:00 in the morning. Tr. at 95.

After she has had some breakfast, and done some housework, Plaintiff said that she needs to rest around 10:00. After she has had some lunch, she said that she tries to take a nap. Tr. at 96. Plaintiff was asked what kinds of house work her children do for her to which she responded that they do the vacuuming and sweeping, the dishes, and that they help her with the laundry. Tr. at 97.

After Plaintiff testified, the ALJ called Carma Mitchell to testify as a vocational expert. Tr. at 100. The ALJ asked the vocational expert to consider a person who was 44 years old with a GED and training as a CNA and past relevant work such as Plaintiff had done. The hypothetical person had obesity, history of asthma, myofascial neck and back pain, medically determinable impairments resulting in complaints of pain of the shoulders, left hip knees and history of cough syncope episodes, a depressive disorder and a history of social phobia.

> As a result of a combination of those impairments, she has the residual functional capacity as follows. She cannot lift more than 20 pounds, routinely lift 10 pounds, with no standing of more than 60 minutes at a time, no walking of more than two to three blocks at a time, no continuous bending, stooping or squatting, no repetitive climbing, no repetitive work with arms overhead. She should avoid more than moderate exposure to dust, smoke, fumes, and pet dander. She is not able to do very complex or technical work, but is able to do more than simple, routine, repetitive work, which does not require very close attention to detail. She should have no more than occasional contact with the public. She does require occasional supervision. She should not work at more than a regular pace and that's using three speeds of pace being fast, regular and slow. And she should not work at

more than a mild to moderate level of stress. Would this individual be able to perform any jobs she previously worked at, either as she performed it or as it is general performed in the national economy?

Tr. at 103–04. In response, the vocational expert testified that Plaintiff would not be able to do any of her past work. The vocational expert testified that Plaintiff's skills would transfer to jobs such as blind aide or companion. She said that both jobs are light semi-skilled jobs. Tr. at 104–05. In addition, the vocational expert said there would be unskilled jobs such as mail clerk, office helper, and photocopy machine operator jobs. Tr. at 105.

In a second hypothetical, the ALJ asked the vocational expert to consider a person who could lift no more than 10 pounds and stand no more than five minutes at a time or sit no longer than 15 to 20 minutes. This question assumed the ability to walk less than one block with occasional bending, stooping, squatting, or climbing and no repetitive work with the arms overhead. In response the vocational expert testified that Plaintiff's skills would no long transfer to other work. Tr. at 106. She also testified that there would be no unskilled work that could be done. When asked if there would be other factors which would affect vocational placement, the expert mentioned Plaintiff's need to take naps in the morning or afternoon (Tr. at 107), which she said would also preclude the ability to work. The vocational expert also testified that four absences per month on an ongoing and unscheduled basis would also preclude work. Tr. at 108.

## ALJ'S DECISION

In his decision, following the familiar five step sequential evaluation (*See Ramirez v. Barnhart*, 292 F.3d 576, 580 (8th Cir.2002)(discussing the sequential evalua-

tion)), the ALJ found that Plaintiff had not engaged in substantial gainful activity after January 31, 2000. At the second step, the ALJ found Plaintiff's severe impairments are: "Obesity, a history of asthma, myofascial neck and back pain, allegations of a medically determinable impairment with complaints of pain in the shoulders, left foot, left hip, knees and elbows, a history of cough and syncope episodes, depressive disorder NOS, and a history of social phobia." The ALJ found that none of the severe impairments, or a combination thereof, meet or equal any listed in Appendix 1, Subpart P, Regulations No. 4. At the fourth step, the ALJ found that Plaintiff is not able to do her past work as a nurse's aide. The ALJ found that Plaintiff has a residual functional capacity consistent with his first hypothetical question to the vocational expert. At the fifth step, the ALJ found that Plaintiff is able to do the semi-skilled and unskilled jobs identified by the vocational expert at the administrative hearing. The ALJ found that Plaintiff was not disabled and that she did not qualify for the benefits for which she had applied. Tr. at 34–36.

## DISCUSSION

The scope of this Court's review is whether the decision of the Secretary in denying disability benefits is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g). *See Lorenzen v. Chater*, 71 F.3d 316, 318 (8th Cir.1995). Substantial evidence is less than a preponderance, but enough so that a reasonable mind might accept it as adequate to support the conclusion. *Pickney v. Chater*, 96 F.3d 294, 296 (8th Cir.1996). We must consider both evidence that supports the Secretary's decision and that which detracts from it, but the denial of benefits shall not be overturned merely because substantial evi-

dence exists in the record to support a contrary decision. *Johnson v. Chater,* 87 F.3d 1015, 1017 (8th Cir.1996) (citations omitted). When evaluating contradictory evidence, if two inconsistent positions are possible and one represents the Secretary's findings, this Court must affirm. *Orrick v. Sullivan,* 966 F.2d 368, 371 (8th Cir.1992) (citation omitted). *Fenton v. Apfel,* 149 F.3d 907, 910–11 (8th Cir.1998).

■ In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record. *Wilcutts v. Apfel,* 143 F.3d 1134, 1136–37 (8th Cir.1998) citing *Brinker v. Weinberger,* 522 F.2d 13, 16 (8th Cir. 1975).

Plaintiff argues that the ALJ should have stopped the sequential evaluation at the third step because her obesity equals the severity of impairments considered preclusive of all work activity regardless of other considerations such as age, education, or past relevant work experience.

■ In support of that argument, Plaintiff points to two Social Security Rulings— SSR 00–3p, and the superceding SSR 02–01p. Published Social Security Rulings are binding on all components of the Social Security Administration, but they do not have the force and effect of the law or regulations. *See Newton v. Chater,* 92 F.3d 688, 693 (8th Cir.1996) citing *Heckler v. Edwards,* 465 U.S. 870, 874 n. 3, 104 S.Ct. 1532, 79 L.Ed.2d 878 (1984). In *Jones v. Barnhart,* 335 F.3d 697, 703–03 (8th Cir.2003), Chief Judge Hansen, in a dissenting opinion states that the Court generally gives deference to the agency's rulings on its own regulations.

At the outset, the Court would state that SSR 02–01p is very helpful in this case. The ruling is quite well written. The Commissioner and all who contributed to the ruling are to be congratulated on a very clear statement of policy regarding the evaluation of obesity in steps two through five of the sequential evaluation. The summarization of the ruling which the Court feels is material to this case, does not do justice to the entire ruling which the Court highly recommends to all judges and lawyers who are working on cases, now or in the future, in which obesity is a severe impairment.

Although listing 9.09 obesity, was removed from the Listing of Impairments in 20 C.F.R., Subpart P, Appendix 1, SSR 02–01p makes it clear that obesity is still considered a severe impairment which, alone or in combination with other impairments, can result in disability. Paragraphs added to listings for the musculoskeletal, respiratory and cardiovascular body system listings,

remind adjudicators to consider [obesity's] effects when evaluating disability. The provisions also remind adjudicators that the combined effects of obesity with other impairments can be greater than the effects of each of the impairments considered separately. They also instruct adjudicators to consider the effects of obesity not only under the listings but also when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity.

SSR 02–01p, 2000 WL 628049 (S.S.A.) at *1.

The ruling states that obesity is a complex, chronic disease which is generally the result of a combination of factors among which are genetic, environmental, and behavioral. Furthermore, the relationships between food intake, energy expenditure, and metabolic processes "are complex and not well understood." *Id.* at *2. The National Institutes of Health have established medical criteria for the diagnosis of obesity

based on Body Mass Index, which is a ratio of an individual's weight in kilograms to the square of his or her height in meters (kg/m$^2$). For adults, the NIH guidelines describe a BMI of 25–29.9 as overweight, and a BMI of 30.0 or above as obese. A BMI in excess of 39.9, is considered "extreme" obesity, and represents the greatest risk for developing obesity related impairments. *Id.* The ruling points out that treatment for obesity is often unsuccessful and that even if there is a short term weight loss, the weight is often regained despite efforts of the individual to maintain it. *Id.*

At step three of the sequential evaluation, the SSR states that an individual with obesity will be found disabled if he or she has another impairment which meets the requirements of a listed impairment. An obese person may also prevail at step three if there is an impairment which in combination with obesity meets the requirements of a listing. "This is especially true of musculoskeletal, respiratory, and cardiovascular impairments. It may also be true for other coexisting or related impairments, including mental disorders." *Id.* at *5. Obesity, by itself, may also be found to be medically equivalent to a listed impairment. "For example, if the obesity is of such a level that it results in an inability to ambulate effectively, ... it may substitute for the major dysfunction of a joint due to any cause..." "We will also find equivalence if an individual has multiple impairments, including obesity, no one of which meets or equals the requirements of a listing, but the combination of impairments is equivalent in severity to a listed impairment." *Id.*

In evaluating residual functional capacity, the SSR states that obesity can cause limitation of function which can be obvious—as when there is a limitation on the ability to sit, stand, walk, or lift. The presence of adipose tissue in the hands and fingers may affect the ability to manipulate. There may also be functional limitations which are not so obvious, such as the effects of sleep apnea which can lead to drowsiness and lack of mental clarity during the day. "Obesity may also affect an individual's social functioning." *Id.* at *6.

The SSR continues: "As explained in SSR 96–8p, ... our RFC assessments must consider an individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis." *Id.* This means eight hours a day, for five days a week, or an equivalent work schedule. Fatigue may be a factor in the ability to sustain such a work schedule. *Id.* citing SSR.

In *Paris v. Schweiker*, 674 F.2d 707 (8th Cir.1982) the claimant was seeking benefits as a disabled widow. At that time, it was necessary that a claimant for widow or widower benefits show that he or she met or equaled a listed impairment in order to prevail. Writing for the Court, Judge Heaney stated:

> The determination of "medical equivalence" must include consideration of laboratory findings, medical observable facts and the claimant's subjective description of impairments. 20 C.F.R. §§ 404.1528–29. Subjective symptoms alone might not be sufficient, but they must be given weight especially when corroborated by clinical or laboratory evaluations. *Id.*

> Here, Mrs. Paris concedes that no single impairment of hers is a listed impairment under the Secretary's regulations. Her contention is that the aggregate of her impairments permanently preclude her from engaging in any gainful activity. The record clearly supports her contention.

*Id.* at 709. The Court held that the ALJ had attempted to isolate each of Paris' medical conditions and to rely on evidence that at any one time not all of the problems were active. "This approach," the Court continued, "fails to account for the overwhelming evidence that Mrs. Paris' impairments have been chronic and recurring, becoming ever more complicated and requiring ever more restrictions with respect to her activity." *Id.* at 710. The Court concluded: "Viewing Mrs. Paris' conditions as a whole, we find it impossible to reasonably conclude that she is capable of any gainful activity. This standard is the core of the medical equivalence test and we find that Mrs. Paris has met it." *Id.*

██ In the case before the Court, it is very clear that Plaintiff's obesity is of an equivalent severity to those listed in the regulations. The above cited Social Security Ruling recognizes that obesity can, by itself, be a disabling condition. The Ruling states that a body mass index in excess of 39.9, is considered "extreme" obesity, and represents the greatest risk for developing obesity related impairments. In Plaintiff's case, given the height/weight data recorded by the various doctors, her body mass index is consistently above 50. Dr. Bernhagen wrote that Plaintiff has an "extremely strong body odor" and that "she actually urinated in our chair." Dr. Bernhagen opined that Plaintiff would not interact appropriately with others in the work place. Dr. Mineart, Plaintiff's primary treating physician, opined that Plaintiff would not be able to sit, stand, or walk for as long as two hours in an eight hour day. He said that Plaintiff would need to take unscheduled breaks from her work and that the breaks would need to last at least five minutes every hour. Dr. Peterson wrote that Plaintiff's obesity affected her ability to do all physical activities as well as aggravate her depression. Dr.

Hines opined that Plaintiff "probably has rather considerable osteoarthritis." Not one of the doctors offers so much as a scintilla of evidence that Plaintiff is able to work. In the opinion of the Court, by finding that Plaintiff has a residual functional capacity to work, the ALJ ignored all of the concrete consequences of Plaintiff's impairments. This is not consistent with the policy stated by the Commissioner in the Social Security Ruling, nor is it consistent with Eighth Circuit case law. *See e.g., Stone v. Harris,* 657 F.2d 210, 212 (8th Cir.1981), in which Judge Peck wrote:

> The district court wrote that, because Stone's obesity has no established physiological cause, her obesity was therefore "remedial" (*sic, vide* "remediable"). The agency is certainly not entitled to presumptions that obesity is remediable or that an individual's failure to lose weight is "willful." The notion that all fat people are self-indulgent souls who eat more than anyone ought appears to be no more than the baseless prejudice of the intolerant svelte. Modern studies debunk this myth. See S. Wooley, O. Wooley & Dyrenforth, *Theoretical, Practical, and Social Issues in Behavioral Treatments of Obesity,* 1. J. Applied Behavior Analysis 3, 5 (1979), and sources cited there.

The ALJ's finding that Plaintiff's impairments, either alone or in combination, do not meet or equal a listed impairment is not supported by substantial evidence on the record as a whole.

## CONCLUSION AND DECISION

In light of the foregoing discussion, it is the holding of this Court that the overwhelming weight of the evidence is that Plaintiff's obesity, in and of itself, is severe enough to preclude any type of employment. Plaintiff's impairment, therefore, is

equivalent to those listed in Appendix 1, Subpart P, Regulations No. 4. The Commissioner's decision is not supported by substantial evidence on the record as a whole. The evidence in this record is transparently one sided against the Commissioner's decision. *See Bradley v. Bowen,* 660 F.Supp. 276, 279 (W.D.Ark.1987). Therefore, reversal with an award of benefits is the appropriate remedy. *Parsons v. Heckler,* 739 F.2d 1334, 1341 (8th Cir. 1984).

Defendant's motion to affirm the Commissioner's decision is denied. This cause is remanded to the Commissioner for computation and payment benefits.

The judgment to be entered will trigger the running of the time in which to file an application for attorney's fees under 28 U.S.C. § 2412(d)(1)(B) (Equal Access to Justice Act). *See Shalala v. Schaefer,* 509 U.S. 292, 113 S.Ct. 2625, 125 L.Ed.2d 239 (1993) and LR 54.2(b).

IT IS SO ORDERED.